UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 18-80124-CR-RUIZ

UNITED STATES

v.

MARK AGRESTI,

Defendant.

_____/

**DEFENDANT MARK AGRESTI'S MOTION FOR NEW
TRIAL BASED ON NEWLY DISCOVERED EVIDENCE AND
UNOPPOSED REQUEST FOR AN EVIDENTIARY HEARING**

Mark Agresti respectfully moves for a new trial under Fed. R. Evid. 33(b)(1), based on newly discovered evidence of perjury and related misconduct undermining the testimony of the government's chief witness at trial, Kenneth Bailynson. The defendant requests an evidentiary hearing in support of the motion for new trial.  The government does not oppose the request for an evidentiary hearing in this case.

At trial, the government argued Agresti "purposefully ripped off insurance companies ... so he could make an easy $18,000 a month."  DE:407 at 36.  Kenneth Bailynson was the principal witness for the government. Notably, the government explained that at the peak of Bailynson's fraudulent business, Bailynson was subjected to a "shakedown" by Agresti for $9,000 monthly cash drops, *id*. at 57, and that the jury should believe Bailynson, because "why would he lie about that?  It doesn't make any sense, ladies and gentlemen.  Those $9,000 in cash, those payments, happened."  *Id*. at 58.  The government argued jurors should believe Bailynson's claim that Agresti shook Bailynson down for dirty money and that Agresti's actions, in combination with other evidence, proved he was a knowing and willful part of the conspiracy.

Recent disclosures undermine the veracity of Bailynson's crucial testimony and confirm that Agresti's testimony denying Bailynson's payment and shakedown allegations was true.  To establish the facts relevant to these disclosures by the government, an evidentiary hearing in

support of the motion for a new trial is requested.  Counsel for the government has advised that the government does not oppose the request for evidentiary hearing in this case.

The newly-discovered evidence shows that: the payments that the government told the jury "happened," *never* happened; Bailynson's constructing of lies to insure Agresti's conviction *did* make perfect sense to Bailynson; Bailynson planned out the perjury to address perceived weaknesses in his ability to transfer guilt to Agresti; due to belated disclosure to the defense of the content of Bailynson's payment and shakedown allegations, on the second day of Bailynson's testimony, fully comprehensive cross-examination of Bailynson was beyond the reach of the defense; and Bailynson, protected from exposure of the perjurious design of his testimony in the circumstances of this case, succeeded in his goal to see Agresti convicted.

## Procedural Background

The instant motion is timely under Fed. R. Crim. P. 33(b)(1) as it is being presented within three years of the February 10, 2022 jury verdict on the charges of health care fraud, in violation of 18 U.S.C. § 1349 (Count 1) and substantive health care fraud, in violation of 18 U.S.C. § 1347 (Counts 2–12).  DE:399.  On May 31, 2022, this Court sentenced Agresti to 100 months' imprisonment.  DE:542.  By agreed motion, Agresti was released on bond after filing his notice of appeal.  Although his appeal remains pending, this Court retains jurisdiction to consider the motion for new trial and to order discovery and an evidentiary hearing on the motion.  *See United States v. Espinosa-Hernandez*, 918 F.2d 911, 913 (11th Cir. 1990)(explaining district court jurisdiction to consider motion for new trial pending appeal).  If, upon consideration of the motion, the Court certifies its intention to grant relief, the court of appeals will remand the case for entry of an order granting a new trial.  *United States v. Ellsworth*, 814 F.2d 613, 614 (11th Cir. 1987).  Under the procedure established in *Ellsworth*, the Court may "either deny the motion on its merits or certify that the motion should be granted in order to afford the appellate court jurisdiction to entertain a motion to remand."  *Id*.; *see also United States v. Arango*, 853 F.2d 810, 821 (11th Cir. 1988).  A defendant is entitled to a new trial based on newly-discovered evidence where he establishes that:  (1) the evidence was discovered after trial; (2) the defendant exercised due diligence to discover the evidence; (3) the

evidence was neither cumulative nor impeaching; (4) the evidence was material; and (5) the evidence was of such a nature that a new trial would probably produce a new result.  *See United States v. Culliver,* 17 F.3d 349, 350-51 (11th Cir. 1994); *United States v. Gates,* 10 F.3d 765, 767 (11th Cir. 1993), *modified*, 20 F.3d 1550 (11th Cir. 1994)).

The basic prosecutorial premise for the indictment and trial of defendant Agresti was that his authorization of comprehensive urinalysis testing of sober house residents was more extensive than necessary to provide drug treatment therapy and monitoring to each resident/patient on an individualized basis. DE:386 (redacted indictment submitted to jury). The competing premise of the defense was that Agresti subjectively believed the use of extensive, frequent testing in a community sober living complex—not merely a home, but a complex of independent living units in a condominium community—would produce better outcomes and higher survival rates, where residents' experience of living at the sobriety center would best serve as a reward and reinforcement to encourage and incentivize sobriety.  The defense was, in effect, 'Yes, I wanted frequent, comprehensive testing, albeit with reductions after a period of proven sobriety, because I thought it would promote sobriety.'

Agresti admitted, and contract documents showed, that the sobriety plan—based on his medical and decades-long psychiatric experience seeing the difficulty, and tragic consequences of failure, in trying to contain or overcome drug addiction—was part of his agreement to work with Bailynson.  Agresti testified that from his very first meeting with Bailynson, he told Bailynson that "we *need* a complex [lab testing] panel [with] frequent testing" in order to "use it as a *tool* to keep the community safe, and [to] remove people who use" drugs, so as to have a community environment that is a "center of sobriety." DE:404 at 22 (emphasis added).

Given that admission by Agresti of ordering the testing at issue, the trial was about whether Agresti, even if negligent in supervising the drug testing, acted with subjectively reasonable intentions or instead acted in bad faith.  In other words, did Agresti act with knowledge and willful intent that the sobriety plan was merely a scam run by Bailynson to criminally employ his own laboratory, without any sobriety-promoting benefit and solely to enable Bailynson to take profits for himself, paying kickbacks to keep the scheme running?

The most meaningful factual dispute at trial was who was lying about Agresti? Bailynson or Agresti himself? *See* DE:407 at 36-75 (government closing argument making lies the theme, with government using the term "lie" more than 35 times in reference to Agresti). To win the argument over who was lying about Agresti's subjective intent, Bailynson, as he subsequently has admitted outside the presence of law enforcement, conceived and used a perjurious set of manufactured allegations in order to make Agresti look like he was taking dirty money and thus make Agresti's sobriety planning beliefs look like they were only about money.

Following Agresti's sentencing, the government obtained, and revealed to the defense, crucially important information about Bailynson's admissions of perjury.  From July to November 2022, the government interviewed witnesses with information pertinent to Bailynson's written and verbal admissions about his trial testimony, including text messages authored by Bailynson in May 2022, after Agresti was sentenced.

FBI witness interviews revealed the following.  In 2022, Bailynson was working with Willie Colon, a felon he had hired to help collect cash rent payments, principally from undocumented aliens to whom Bailynson was renting out apartments in the complexes he owned and controlled.  Bailynson befriended Colon when Bailynson was in federal custody, before his release on bond. Colon had a close, protective relationship with Bailynson, and Bailynson trusted him.  Colon's work for Bailynson, collecting cash rent from undocumented-alien tenants, facilitated Bailynson's need for cash that he could hide from the government to avoid paying financial penalties in this case.  Bailynson was using Colon and another associate, Renee Favor, to collect cash from tenants to whom Bailynson was illegally providing rental housing (in violation of immigration laws (*see* 8 U.S.C. § 1324(a)(1)(A)(iii)).  This illegal cash-hiding and alien-harboring scheme was ongoing during the time that Bailynson was meeting and cooperating with the government and continued after he testified against Agresti.

In conversations with Colon, Bailynson vented about his ill will towards Agresti and about his decision to testify in the Agresti trial to events that never actually occurred in order to make his cooperation important enough to warrant sentence reduction and to convince a jury Agresti was a knowing criminal participant.  Bailynson explained to Colon how he had analyzed

the case and determined it would be difficult to convince a jury that anything Agresti did was criminal in nature, where the sobriety plan was working and Agresti did not profit in a way that would suggest his knowledge of fraud or the extent of the billing.   Bailynson stated that he therefore came up with a lie about Agresti's shaking him down for cash payments, a lie that would indelibly tarnish Agresti.

The government interviewed Colon without offering Colon any benefit for providing information about Bailynson's crimes in relation to the trial proceedings.   The report of interview dated September 13, 2022 reflects the following:

> BAILYNSON talked to COLON about trial and testifying after they were both out of jail. BAILYNSON told COLON over a telephone conversation that he made up the story about the dead employee bringing the cash to the doctor because the government would not be able to confirm the story since the guy was dead. BAILYNSON told COLON that he never paid the doctor in cash and that he made it up because the government did not have anything else on the doctor. COLON did not want to hear what BAILYNSON was telling him and did not say a word to BAILYNSON about it in response. BAILYNSON told COLON that his story was credible at trial. BAILYNSON was mad that the doctor was only sentenced to eight years in prison. BAILYNSON said the doctor should have been sentenced to 15 years in prison. The only thing COLON remembers BAILYNSON telling him that he lied about when he testified was about paying the doctor cash.

FBI 302 report of interview of Willie Colon (Sept. 13, 2022).

In text messages dated May 28, 2022, following Agresti's sentencing, Colon confirmed with Bailynson that Bailynson lied about the cash payments in order to prejudice Agresti at his trial and to win sentencing benefits for Bailynson.   Bailynson explained that the answer to the question, "Why do you think I said the stuff about the cash?," was that he would not have "gotten 6 [years] if [Agresti] was found not guilty."  *Id.*

Supporting Colon's explanation of Bailynson's callous perjury that Colon reported to the government was an FBI interview of Renee Favor on August 10, 2022.  She, like Colon, had been enlisted by Bailynson as part of his effort to take cash from illegal immigrants for illegal housing, at apartment complexes owned by Bailynson, and to hide his actions and cash from the government.   She related that "Bailynson rented his apartments mostly to illegal immigrants

because if they did not pay rent, Bailynson would kick them out." FBI 302 report of interview of Renee Favor (Aug. 10, 2022). Favor also notified the FBI of lies Bailynson told the Court about his health and substance abuse to obtain sentencing consideration.

In a second interview, on August 19, 2022, Favor noted that over the course of less than two years, she had collected "approximately $300,000 in cash" for Bailynson. FBI 302 report of interview of Renee Favor (Aug. 19, 2022). After Bailynson's sentencing, Favor received Bailynson's cellular phone, and in July 2022, she turned it over to Colon, who has provided it to the government. Favor confirmed seeing screenshot images of text messages from Bailynson to Colon shown to her by Colon. Favor would sometimes act as a driver for Bailynson when he would go to debriefings with the government while he was out on bond. Favor related that Bailynson "was focused on the doctor and wanted to 'give it to the doctor,'" and Bailynson "wanted to deflect his culpability on the doctor." *Id*. Favor related other fraud crimes Bailynson committed, including rental assistance fraud, and explained how Bailynson was hiding assets and his ownership of property to avoid financial penalties, all during his cooperation with the government. (In a May 27, 2022 text to Colon, Bailynson bragged that he had managed to keep a house and money from the government's reach.) Favor observed that Bailynson "was upset [that Agresti] was only sentenced to eight years and felt his testimony should have resulted in a stiffer sentence for the doctor." *Id*. Favor allowed the FBI to extract from her phone all text messages between Favor and Colon as well as between Favor and Bailynson.

The government, in a step reflecting concern that other aspects of Bailynson's testimony may have been perjured, then interviewed attorney Michael Segal, who had represented Bailynson in his business activities. Segal's name had been used by Bailynson at trial to bolster his lies about paying cash to Agresti. *See* DE:378 at 60 ("Q. There's no evidence to support this mystery $9,000 extra a month that you paid Dr. Agresti except your word, the word of a liar? A. There is. Q. Do you want to share that with us? A. You can contact my attorney, Mike Siegel (sic). I had several conversations with him about it. Q. So your attorney, Mike Siegel, was in on the fact that you were paying cash and not reporting it on the books? A. He was aware of it.").

Because Bailynson had (falsely) claimed to have had the cash payments okayed by Michael Segal, the FBI interviewed attorneys Michael and Fred Segal on November 8, 2022. But both Michael and Fred Segal, in their interview, disputed Bailynson's story.  FBI 302 report of interview of Michael and Fred Segal (Nov. 8, 2022).  Fred Segal stated that he "could not recall any oral conversations with BAILYNSON related to cash payments made to Dr. MARK AGRESTI."  *Id*.  And Michael Segal "recalled BAILYNSON and having conversations with him, however, nothing related to cash payments from BAILYNSON to AGRESTI."  *Id*.  Further, "MIKE reviewed his file and FRED's file from BAILYNSON and did not find any memo related to such cash payments to AGRESTI."  *Id*.

The government then contacted Bailynson for a telephonic interview on November 15, 2022, to ask him if he could explain his admissions of perjury.  Bailynson claimed that he never lied while testifying in court and offered as an explanation of his admissions of perjury to Colon as follows:  Bailynson "did not want people in jail to know he was helping the government," and that is why he admitted having committed perjury to frame Agresti for the government.  FBI 302 report of interview of Kenneth Bailynson (Nov. 15, 2022).  Bailynson conceded that he had told Colon about his plan to commit perjury to convict Agresti while he was still in custody, before Agresti's trial, and that he confirmed the perjury in text messages with Colon after the testimony. *Id*. Bailynson's timeline for telling Colon about a deceased man "Fred" at an earlier time when he was in custody conflicts with Bailynson's trial testimony that he "didn't know Fred was dead until, I guess, two months ago." DE:378 at 514.  Bailynson, also apparently forgetting the details of the testimony he offered at trial that contemplated only one (or at most two) monthly cash payments from "Fred," in the period from July 2014 to the date of Agresti's resignation in early August 2014, told the FBI in that "he gave $9,000 in cash to FRED *several times* to deliver to AGRESTI." FBI 302 report of interview of Bailynson (Nov. 15, 2022) (emphasis added).

The FBI also obtained information from Matthew Noel, who has been released from prison and would be available to testify at an evidentiary hearing.  Noel's name was used by Bailynson in connection with the cash payment story, although Bailynson did not testify that Noel was aware of the purported payments.  Noel conveyed that he learned from speaking to Bailynson in prison that "he is planning an even more egregious scheme than his healthcare

fraud, and that he intends to hide his assets from" the government.  FBI 302 report of interview of Matthew Noel. The FBI did not interview Noel regarding the "Fred" story. Bailynson's response to information provided by Favor, Colon, and Noel was to attack them personally. Tellingly, in speaking to the FBI, Bailynson accused Noel—just as he had accused Agresti—of "shaking" him down for money and said "FAVOR and COLON stole approximately $100,000 from the rent they collected." FBI 302 report of interview of Bailynson (Nov. 15, 2022).

The reports the government has provided from these initial interviews make clear that the evidence Colon provided to the government concerning Bailynson was truthful.  Bailynson's own text message record showed him admitting his perjury plan and explaining why he did it. Bailynson admitted these text messages were not his only admissions of perjury, and that he had admitted his perjury plan to Colon in 2020.  Bailynson understood, and resented, that Agresti was a psychiatrist of good standing and repute. Bailynson knew he had to make a special effort to drag him down to a lower level if Bailynson's testimony were to win Agresti's conviction and Bailynson's favorable plea deal and sentence reduction.  Each of the five interviewed witnesses, in addition to Bailynson, should be heard from at an evidentiary hearing, where the parties can explore the facts showing Bailynson's deception employed to achieve Agresti's conviction.

After the government provided post-sentencing disclosure of Bailynson's admission of lies, Agresti's defense counsel sought other means of showing that Bailynson's story was false. First, Bailynson had included one traceable meeting detail in his testimony: that he and Agresti had a memorable lunch at the Palm Beach Yacht Club approximately one month after giving Agresti (at Agresti's office) a check, dated May 21, 2022, for $9,000.  This purported Yacht Club lunch meeting, which, if it had occurred, would have been in June, or at the latest July, of 2014, never occurred, however.  The defense has obtained the Yacht Club's detailed records of every visit ever made and every financial transaction ever conducted by Agresti, including every lunch.  (At the Club, all transactions are by member credit card and are placed on the member's account.)  Agresti did not have lunch at the Yacht Club in June or July 2014.  In fact, he had no lunches at all at the Club after May 2014, refuting Bailynson's story of Agresti telling him there was no need for Bailynson to pay for lunch because Bailynson had "already paid for lunch" by making a (second) monthly cash payment to Agresti.

The defense also sought to reconstruct the cloak-and-dagger claim by Bailynson that he had a since-deceased man known as "Fred" (Bailynson also told the FBI in 2020 the individual was known as "Black Fred") deliver $9,000 cash payments to Agresti by knocking on Agresti's office window and placing money in Agresti's car.   Review of the office layout, parking configuration, and the means of access to the opaque window of Agresti's office calls into question this element of Bailynson's story as well. "Fred" would have had to walk around the building to the visible street side, tap on a window through which he could not have seen if anyone were in that office, then go back to a parking area some distance away on the other side of the building where it is unclear whether a key fob would have worked to unlock Agresti's car. The physical layout of the office and parking made the story of drops by "Fred" strained at best.

Most importantly, following the admissions by Bailynson of his perjury and his fervent effort to both help himself and justify his lies by stoking his hatred of Agresti, one of the leading FBI polygraphers in the country (now retired), James T. Orr, conducted a focused polygraph examination of Agresti on Bailynson's stories of illicit cash payments.   Mr. Orr's credentials and reputation are stellar.   Attached are Mr. Orr's report, explanatory attachment, and curriculum vitae. *See* Exhibit A.  Agresti's polygraph examination scores are exceedingly strong in showing that Bailynson's cash shakedown story was completely false. The polygraph examination confirms what Bailynson's text messages reflect: Bailynson lied.  Mr. Orr went over the cash issue with Agresti every way that made sense, focusing on each of the claimed cash payments, none of which ever happened.

Mr. Orr was an FBI agent from 1983 to 2011 and became a certified FBI polygraph examiner in 1999.  He not only conducted exams at the FBI, he also trained and supervised other agents in conducting exams.  Mr. Orr has conducted over 3,100 polygraph exams while at the FBI and in private practice for attorneys, law enforcement, private companies, military contractors, and international security consulting firms.  He was the primary instructor at the Academy of Polygraph Science, an APA and AAPP accredited school, from 2012 to 2016.  He has lectured at several universities and even internationally on behalf of the U.S. Department of State. He is a member of the Florida Polygraph Association and served on its Board of Directors and as its Vice President.  His polygraphs have been admitted in federal trial and post-trial

proceedings.  Agresti's polygraph examination scores on Bailynson's perjurious claims were far above the level at which reliance can be given to the results.  The examination yielded reliable confirmation that there is not a grain of truth in Bailynson's lies about cash payments, lies that severely prejudiced Agresti and benefitted Bailynson.

> **The totality of corroborative evidence showing that Bailynson's confession was likely a true admission of his deceit at trial compels conducting an evidentiary hearing.**

Bailynson's lies about Michael Segal okaying the cash payments, his lies about a luncheon meeting and cash exchange, the lack of consistency, coherence, or logic to the "Fred" stories, the absence of any sign of the cash or anything else related to the cash anywhere at anytime, the next-level criminality of the purported occurrence, his related lies, deceit, and crimes while cooperating with the government (including while testifying), and the chilling nature of Bailynson's explanation of why he perjured himself all point to a credible allegation of perjury in this case warranting an evidentiary hearing.  Bailynson's written and verbal admissions of perjury to make Agresti look like a criminal at trial, all done because Bailynson feared jurors otherwise would not believe Agresti acted with criminal intent, constitutes one of the most significant post-trial revelations of perjury in reported case law. The government has agreed with Agresti's request for an evidentiary hearing.

### Significance of Bailynson's Testimony

Bailynson furnished centrally relevant and singular evidence on behalf of the prosecution.  The government stated it frankly at Bailynson's sentencing:  "Without him, there would not have been a conviction, I don't think. I suppose the expert was – but really, without Mr. Bailynson, there was no chance of a conviction." DE:521 at 7-8 (April 20. 2022 sentencing transcript).  The government gave Bailynson his very favorable plea deal, DE:309, only after the March 2020 interview where he made the cash claims that the government, during the interview, made special note of as having elements that would even present problems for the defendant's relationship with his wife (of more than 30 years), who was then a possible defense witness. DE:478:513.  When Bailynson decided to resolve his case and cooperate, co-defendants Noel and Curran were already cooperating with the government.  Bailynson knew the only co-

defendant he could go after then was Agresti, and to get the maximum benefit, he had to create the most effective story.

The Court, at sentencing, after considering the government's comments and indicating that Bailynson's plea deal itself appeared to be a windfall to Bailynson, specifically agreed that without Bailynson's efforts, Agresti would likely not have been convicted.   DE:521 at 34 (concluding that absent Bailynson, "nothing would have happened in the Agresti case"). But the Court also explained to Bailynson that the Court was not convinced by Bailynson's claims of honest remorse, telling Bailynson "there is a part of you that needs a lot of work and it deals with that *outsmarting others*, that greed, and that *anger* which led you to do this and led you really to *manipulate a lot of individuals*."   DE:521 at 37 (emphasis added).

The totality of the Bailynson evidence shows that the government successfully used him as its foundation for proving the charged conspiracy and substantive healthcare fraud charges against Agresti. Bailynson clearly falls into the star witness category described as being of fundamental importance to the prosecution's case.   *See United States v. Lankford*, 955 F.2d 1545, 1548 (11th Cir. 1992) ("[W]here the witness sought to be cross-examined is the government's 'star' witness, 'providing an essential link in the prosecution's case, the importance of full cross-examination to disclose possible bias is necessarily increased.'") (quoting *Greene v. Wainwright*, 634 F.2d 272, 275 (5th Cir. 1981)); *United States v. Partin*, 493 F.2d 750, 760 (5th Cir. 1974) ("[W]here the government's case in a criminal prosecution may stand or fall on the jury's belief or disbelief of one witness, that witness's credibility is subject to close scrutiny.").   Where the government admits it cannot win the case unless it elevates its own star witness's credibility above that of the defendant, pressing to the jury its message about who has a motive and incentive to lie, the lies told by the witness are of crucial importance.

The testimony was relevant to more than just a slim portion of the charges; it went to the core dispute in the case: did Agresti act with willful, criminal intent? Had Bailynson's testimony been exposed as premised even in part on designed perjury, Agresti's contrary explanation would have been substantially more credible.   In fact, a reasonable defense strategy if the evidence of the perjury were available, would be to present no defense witnesses at all, where even the government concedes that conviction was not possible without Bailynson. *See United*

*States v. Camargo-Vergara*, 57 F.3d 993, 999 (11th Cir. 1995) (absent the violation, defendant "could have changed his trial strategy."); *see also United States v. Rodriguez*, 799 F.2d 649, 654 (11th Cir. 1986) ("The district court partially rested its decision on Rodriguez's testimony denying the existence of personal items.  This *bolsters, rather than weakens*, *defendant's case for a mistrial*."); *United States v. Noe*, 821 F.2d 604, 608 (11th Cir. 1987) (explaining that the impact of a violation on defense strategy in presenting the defendant's testimony is itself grounds for relief; "Likewise, had Noe been aware of the tape recording prior to trial, his counsel might well have advised him not to take the stand.") (quotation omitted); *United States v. Padrone*, 406 F.2d 560, 561 (2d Cir. 1969) (recognizing potential harm from violations on defense case presentation).  Bailynson's testimony was at least that significant to the government's case against Agresti.

### Singular Significance of Bailynson's Cash Payments Claims

Bailynson's energetic expressions of satisfaction at having gamed the system by making Agresti look like a criminal illustrate just how fundamental Bailynson's scheme was to obtaining Agresti's conviction.  And at Bailynson's sentencing, he sought to emphasize his importance, and, as noted above, the significance of his testimony was correctly recognized by the government—and by the Court, albeit with the Court's concerns regarding Bailynson's capacity for manipulation and outsmarting of others and acting out of anger.  With regard to Bailynson's cash shakedown story, it is no wonder that the defense admitted to being disturbed by the allegations, even as the defense lacked the means to debunk the story at trial.  DE:378:114.  The special significance of the cash shakedown story to Bailynson's ability to claim insight into Agresti's intent is also seen in that Bailynson testified to only a handful of meetings that he ever had with Agresti, such that his two supposed meetings with Agresti about being pressured to pay immediate cash payments as part of a shakedown formed his principal claims of in-person interaction with Agresti.

The government emphasized to the jury the multi-faceted importance of Bailynson's cash shakedown story, providing not only a basis to believe Agresti was knowingly profiting from fraud, but that he was capable of extorting Bailynson because he knew how much money Bailynson wss fraudulently scamming.  DE:407 at 57 ("Ken Bailynson knew at that moment that

this was a shakedown and that the defendant was going to ask for more money, and that's exactly what happened."); *id*. at 58 ("Yeah.  You're going to pay me more money, $9,000 in check and $9,000 in cash per month for the rest of GDSL's life.  ... And – I mean, as for the cash, yeah, there's – of course, there's no record of it.  That's – that's why the defendant wanted it that way.  But why would Bailynson have wanted to pay the defendant in cash?  You heard Bailynson.  For all of his faults, he is a CPA.  He's a numbers guy, and by his own admission, the only thing he cared about was money.  After all the corroboration you've seen, why would he lie about that?  It doesn't make any sense, ladies and gentlemen.  Those $9,000 in cash, those payments, happened."); DE:407 at 137 (government tells jury: "all of the evidence in this case backs up Mr. Bailynson the so-called con man and liar").

The significance of the testimony is reflected in part by the fact that Bailynson told the story in his first proffer, where he was trying to obtain the best plea deal possible, in 2020.  He ultimately obtained that plea agreement thereafter (DE:309).  Notably, in debriefing him, the government confirmed to Bailynson that this cash story would have particular effect on Agresti in that it would make him look to be unfaithful or deceitful to his wife of 32 years, a part of the story Bailynson gladly included (also embarrassing Mrs. Agresti, who was a potential defense witness).  DE:378 at 123.

Agresti, at trial, was forced to make a direct denial of that story, and the government then repeatedly called Agresti a liar.  *See*, *e.g.*, DE:407 at 36, 38, 67 (government tells jury of Agresti's "lies that have come out of the defendant's mouth"; "the lie gets even worse"; "[m]ore lies, this time right to your face"; "You know that's a lie ... . No one is hiding anything from this defendant.  So when the defendant took the witness stand in this case, he told you lie after lie after lie, and that is how you know – again, how you know he knew what he was doing was a fraud."; "the lie after lie after lie that you've heard from this defendant").  The government's theme of who is lying permeated closing argument, with the government claiming that on every point of disagreement between Bailynson and Agresti, the jurors should believe Agresti was lying.

The government admitted to the jury that just having Bailynson say that Agresti was in on the fraud by testifying "I couldn't have done it without Dr. Agresti," DE:407 at 130, was a

thin basis for conviction.  But Bailynson had that same understanding, and he knew he had to make Agresti look like a common criminal, bringing Agresti not just down to, but below, Bailynson's level.  That understanding was how Bailynson justified lying to make Agresti look not merely like someone who should have taken more care to watch out for Bailynson's fraud, but rather someone who actively embraced and used the fraud to his own deliberate criminal advantage.  That next level of proof created a fast-track to Agresti's conviction.

The government directly challenged Agresti's attempt to label Bailynson "a con man, and ... deceitful."  DE:407 at 53 (government closing argument:  "So when the defendant told you that, that was a lie.  That was – that was a straight-up lie. Ken Bailynson, Felicia Calame they were not hiding anything."); *id*. at 54 ("if they were trying to pull a fast one, they were trying to do lab testing without his knowledge, why are they communicating with him like this?  They're the worst – I mean, they're the worst liars, hiders, or whatever that I've ever seen.").

The government needed to do this because the issue of medical necessity was unique in this case and was essentially cost-based.  The government at one point conceded that regular comprehensive testing that conveyed to the residents that everything they could abuse was being screened was a strong deterrent, even if the doctor did not get immediate test results.  And in closing argument, the government went so far as to say weekly comprehensive testing would not have been objectionable.  Further, the government's argument regarding limited personal review of test results by the physician faced countervailing evidence that the lab itself (GDSL or its contracted workers) could read the reports, and that the nature of the reports was such that they provided facial indications that could be read and acted on by GDSL.  Also, the short term involvement of Agresti in the Real Life Treatment Center made it difficult for the government to show that confirmatory testing was authorized for too long a period of time for any patient in that treatment environment.

The government could have simply tried to downplay or not even present the hearsay story of the cash shakedown and mystery man Fred's actions, so as not to use a purported dead man's disparagement to create a bogus allegation of another conspirator.  But the government knowing its importance, it was emphasized in multiple ways.  Given sufficient notice, the defense could have found or at least identified the mystery Fred and shown his character to be

the contrary of what Bailynson alleged, but Bailynson instead made it a crucial focal point that was used to Agresti's prejudice, including in the government's closing argument.

The government did not just assure the jury of the truth of Bailynson's overall view of Agresti's knowledge and intent, but did so specifically for the cash story itself, a story the government knew, and defense counsel confirmed, was a particularly disturbing allegation even to Agresti's own family members.

**Unique Prejudice Due to Materially Incomplete Provision of FBI 302s Before Trial**

Agresti's defense attorneys have all stated, and are willing to testify, that Agresti unequivocally said Bailynson was lying about the cash story from the moment it came up, and the attorneys believed Agresti after interviewing him following disclosure of the story on the second day of Bailynson's testimony. (The late disclosure resulted in a one-day continuance of trial, on January 27, 2022, to address the entire newly-produced FBI 302 report, but it appears that any meaningful defense of the cash story would have required a mistrial, which would have involved substantial costs to the parties, the jurors, and the Court.)

Bailynson's story was impactful and a surprise to the defense. The FBI 302 (from March 2020) containing the bogus story about cash payments and related allegations was a total surprise to all three trial lawyers for Agresti when produced after the second day of Bailynson's testimony. The defense was left with no way to deal with it mid-trial given the nature of the defense preparation and the voluminous documentary and expert witness issues that the defense was also facing. Importantly, because Bailynson cleverly used a story about a dead man, so as to avoid being contradicted about supposed cash drops, the defense did not believe a continuance without a mistrial would be an effective remedy. Due to the late disclosure, the defense had no means to deal with it other than to call Agresti to the stand to refute it. The government thereafter assailed Agresti as the liar.

If the defense had not been led to believe the government had already provided Bailynson's complete interviews prior to trial, *see* DE:377 at 5–6, the attorneys would have had an opportunity to focus on it, including with a polygraph examination performed on Agresti and other evidence that might well have caused the government, as early as 2021, to come to the conclusion that they could not rely on Bailynson at all. Not every topic can be polygraphed

effectively, including vague questions of intent or suspicion; but the Bailynson story was perfect for polygraph testing, and Agresti was clearly willing to take such an examination. That Bailynson was lying about a matter of such crucial and prejudicial importance shows a grave miscarriage of justice.

The defense response was clearly hindered; the team lacked time to investigate Michael Segal story, for example, which came out only on cross-examination of Bailynson, or the identity of "Fred" to debunk Bailynson's effort to make Fred look like a criminal bag man. The defense, absent the delayed disclosure, could have taken steps to obtain access to Agresti's former office, to show the physical unlikelihood of the asserted fob-use cash drop plan, where the parking lot was on the other side of the building and the process suggested by Bailynson's story would have required actions inconsistent with a discreet cash drop, and would have had "Fred" going out to the public street to make a display of himself even to tap a window of Agresti's office.

The one-day continuance to address all matters in the late-disclosed FBI 302 left no time for the defense to become mired in an investigation in the middle of trial. The defense team could have ended or resolved the prosecution entirely upon demonstrating Bailynson's proffered perjury, but the government had failed to provide the crucial report needed to even begin to construct a defense to the multi-faceted cash story. Indeed, but for the delayed FBI 302 production, Bailynson may not have testified at all. The failure of production by the government was made all the more prejudicial because the defense believed it had been given all of the relevant FBI 302s.

**An Evidentiary Hearing Is Essential to Resolution of the Motion for New Trial**

Bailynson's perjurious testimony helped the government overcome two severe problems: (1) a comparatively low salary paid to Agresti in comparison with tens of millions of dollars going to master schemer Bailynson, and (2) the facial terms of the Bailynson-Agresti employment contract that made it clear Bailynson was primarily responsible for review of lab testing given its sole function of establishing sobriety of residents so they could meet the core condition for continued residency. *See* DE:375 at 55 (defense opening statement: "Dr. Agresti

signed a contract in good faith."). Agresti, in his contractual dealings with Bailynson, had foresworn responsibility for test review except in special instances where it might be deemed needed, Govt. Ex. 8, because he could not take on such a large patient pool and was not being compensated to take on treatment responsibility for all residents.[1] The contract provided that any individual treatment, *if desired by residents*, would be an entirely separate matter and not part of any agreement to consult for Bailynson. Gov't Ex. 8. Consequently, the contract did not provide for compensation consistent with Agresti's awareness of the fraudulent overbilling and abuse of the sobriety plan.

Bailynson, upon evaluating his litigation options, was also aware of the government's problems in securing a conviction of Agresti, where the government sought any information from him that could be used against the doctor or to undermine the defense. Bailynson came up with a testimonial script that would tar Agresti as a criminal and make it impossible for the jury to view Agresti as a well-meaning psychiatrist—a board certified psychiatrist practicing since 1988—who had spent a career saving people with severe, multi-faceted mental health and addiction problems. Bailynson's plan was simple: invent unverifiable, undated, imaginary interactions between a dead man and Agresti (and himself and Agresti), in which Agresti accepts dirty cash in dirty transactions, in a manner culled from a well-worn crime movie script.

Bailynson admitted, on multiple occasions, to his cohort Colon—who was being used by Bailynson to help him avoid compliance with financial disclosure provisions of his plea agreement and to hide assets—that he invented the story of the dirty cash exchanges with Agresti. Bailynson admitted that he did so knowing that Agresti would otherwise not be convicted and that Bailynson would then be left without the major sentencing benefit he was expecting from successful cooperation. Bailynson explained that he feared that without his perjurious story, his testimony could not otherwise convince a jury that there was anything dirty or criminal about Agresti believing in the deterrent effect of testing and the resulting

---

[1] The GDSL contract for Agresti's services, Gov't Ex. 8, provided that he would be available only on an "if needed" basis to review lab results, indicating the primary reviewing entity would be GDSL.

reinforcement of sobriety in the residential community—where Agresti did not correspondingly profit from the fraud.

Bailynson's well-planned perjury, given the government's embracing of his testimony as essential to conviction, warrant a new trial.  Importantly, the government has quite properly agreed to produce Bailynson's cell phone for forensic examination and has agreed that an evidentiary hearing should be conducted.  *See Banks v. Dretke*, 540 U.S. 668, 696 (2004) ("We have several times underscored the 'special role played by the American prosecutor in the search for truth in criminal trials'") (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999).  With the government's agreement to provide access to the cell phone and its storage media, forensic examination will assist the defense in dispelling Bailynson's claims, including regarding communications incident to events he manufactured for trial.  Particularly relevant would be information regarding "Fred" who allegedly died prior to trial.  Disclosure of cell phone evidence will also likely lead to more truthful admissions by Bailynson at an evidentiary hearing.

The proof of Bailynson's fundamental case-dynamic-altering testimony comes not merely from his own written and spoken words, but also from a confirming polygraph test performed by a leading polygraph expert, James Orr.  *See* Exhibit A (composite).  Agresti's truthful denial of the Bailynson dirty-money claims, along with Bailynson's admission of having designed the false testimony for the very purpose of overcoming the defense of good faith, show that the falsity that underlies the convictions compels a new trial.

The Eleventh Circuit has recognized that a defendant is entitled to an evidentiary hearing on a motion for a new trial if he "has made sufficient allegations so that it cannot be conclusively stated that he is entitled to no relief."  *United States v. Yizar*, 956 F.2d 230, 234 (11th Cir. 1992) (ruling that trial court abused its discretion in denying evidentiary hearing in connection with motion for new trial based on newly-discovered evidence; remanding for evidentiary hearing on motion).  In view of the record showing of material misrepresentations in the trial testimony, as disclosed by newly-discovered evidence, an evidentiary hearing is needed in this case, and the government does not oppose granting the request for that hearing.

18

*United States v. Valdes*, 2010 WL 11629648 (No. 07-20288-Cr-Altonaga, S.D. Fla., Nov. 22, 2010), presents circumstances analogous to the instant case.  In *Valdes*, a Medicare fraud prosecution, the Court, following careful analysis of the applicable law, granted a new trial based on newly-discovered evidence that a key witness had testified falsely.  The Court recognized that perjured testimony may not be characterized as cumulative, where there is no other evidence on the subject of the perjury; nor does newly-discovered evidence revealing the perjury constitute mere impeachment, where, upon exposure of the perjury, a new trial would probably produce a different result.  The impact of perjured testimony in this context is to taint the conviction, by disclosing the deceptiveness of the witness and providing new substantive proof as to the matter about which the witness previously testified.  *Id.* at 21 & n.4 (citing *Mesarosh v. United States*, 352 U.S. 1 (1956), and *Communist Party of U.S. v. Subversive Activities Control Bd.*, 351 U.S. 115 (1956), in which new trials were warranted on the basis of evidence that a key witness had committed perjury in *similar* proceedings; noting, inter alia, the Supreme Court's recognition in *Mesarosh*, 352 U.S. at 14, that "[t]he government of [a] strong and free nation does not need convictions based upon such [perjurious] testimony.  It cannot afford to abide with them.").

The Court in *Valdes* relied further in substantial part on the Eleventh Circuit's ruling in *United States v. Espinosa-Hernandez*, 918 F.2d 911, 913 (11th Cir. 1990), which reversed the denial of a new trial on the basis of newly discovered evidence showing that a key government witness had been indicted, after the conclusion of the trial, on serious criminal charges, including making false statements.  *See Valdes*, at 20-21.  The Court in *Espinosa-Hernandez* made clear that it was "impossible" to determine that the new evidence of the witness' misconduct was merely impeaching; instead, discovery was required to ascertain if the witness had committed perjury when testifying, which, in turn, would require a new trial to "remove the taint" from the defendant's conviction.  *Id.  See also United States v. Fernandez*, 136 F.3d at 1434, 1438-40 (11th Cir. 1998) (in drug conspiracy and importation case, remanding for evidentiary hearing on newly discovered evidence of Venezuelan general's possible culpability and intertwined *Brady* claims premised on possible improper U.S. government agency involvement, where movant fulfilled new-trial standard of demonstrating that "the evidence was discovered after trial, that

due diligence was shown, and that the evidence was neither cumulative nor impeaching but actually material and likely to produce a new result") (citing *Branca v. Security Ben. Life Ins. Co.*, 789 F.2d 1511, 1512 (11th Cir. 1986) (per curiam)); *United States v. Dickerson*, 248 F.3d 1036, 1041–42 (11th Cir. 2001) (Perjured testimony is material if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.").

To be clear, this Court has discretion to maintain the appearance of justice and the integrity of judicial proceedings.  Courts have never been reversed, to our knowledge, for granting an evidentiary hearing—fair to both parties—on a motion for new trial based on the use of perjury by a crucial government witness.  *See*, *e.g.*, *United States v. Gates*, 10 F.3d 765, 767–68 (11th Cir. 1993)(vacating denial of defendant's motion for a new trial based upon newly discovered evidence, consisted of a convicted co-defendant's affidavit exculpating the defendant, and remanding for hearing on the motion:  "We are aware that post-trial exculpatory statements given by a convicted co-defendant must be viewed with care.  We do not suggest or hint that Gates's motion should be granted.  But we do hold that it could not be denied without a hearing to explore further and determine whether it has merit."), *modified*, 20 F.3d 1550 (11th Cir. 1994); *United States v. Fernandez*, 136 F.3d at 1434, 1438–40 (11th Cir. 1998) (remanding for evidentiary hearing on newly discovered evidence claim).

WHEREFORE, Defendant Mark Agresti, respectfully requests that an evidentiary hearing be granted on the motion new trial.  The government does not oppose that request and has agreed further to provide Bailynson's cell phone for forensic examination.  Defendant respectfully requests that, following an evidentiary hearing, the Court issue an order certifying to the Eleventh Circuit under *United States v. Ellsworth*, 814 F.2d 613 (11th Cir. 1987), that the Court would grant the motion for a new trial if the case were remanded to this Court; and, thereafter, order the requested new trial.

Respectfully submitted,

/s/ Greg Rosenfeld                          /s/ Richard C. Klugh
GREG ROSENFELD, ESQ.               RICHARD C. KLUGH, ESQ.
Florida Bar No.: 0092006                  Florida Bar No.: 305294
LAW OFFICES OF GREG ROSENFELD, P.A.      RICHARD C. KLUGH, P.A.
515 N. Flagler Drive, Suite P-300       40 N.W. Third Street, PH1
West Palm Beach, Florida 33401          Miami, Florida 33128
(561) 409-5804                          (305) 536-1191
Greg@rosenfeldlegal.com                 rklugh@klughlaw.com

# EXHIBIT  A

**Agresti Polygraph Report and Supporting Documents**



**Tampa Polygraph Services, LLC**
James Orr Polygraph Examiner
FBI Special Agent, retired

(813) 504-2533                                          orrpoly@gmail.com
14502 N. Dale Mabry Highway, Suite 200          www.tampapolygraphservices.com
Tampa, Florida 33618

**MARK G. AGRESTI, M.D.**
**POLYGRAPH EXAMINATION REPORT**
**POLYGRAPH EXAMINATION DATE: SEPTEMBER 1, 2022**
**DATE PREPARED: SEPTEMBER 1, 2022**

**PREPARED FOR:**
**RICHARD C. KLUGH, P.A.**
**40 NORTHWEST 3RD STREET**
**PENTHOUSE ONE**
**MIAMI, FLORIDA  33128**

**REPORT BY:**

**JAMES T. ORR**

**CASE ID:  22-09013138**

EXHIBIT  A

## **TABLE OF CONTENTS**

Page 2............................................................................... Table of Contents

Page 3............................................................................... Request for Polygraph Examination

Page 3............................................................................... Background

Page 4............................................................................... Suitability

Page 4............................................................................... Consent and Interview

Page 4............................................................................... Relevant Questions

Page 4............................................................................... Methodology

Page 5............................................................................... Examination Techniques

Page 5............................................................................... Chart Evaluation

Page 5............................................................................... Instrumentation

EXHIBIT  A

**REQUEST FOR POLYGRAPH EXAMINATION**

Richard C. Klugh, Esq. contacted James Orr at Tampa Polygraph Services, LLC and made a request that his client, Mark G. Agresti, M.D., be afforded a polygraph examination to determine whether he received $9,000 "under the table" cash payments from Kenneth Bailynson in 2014.

**BACKGROUND**

Review of discovery documents, which included the indictment, transcript of Dr. Agresti's testimony, transcript of Kenneth Bailynson's testimony, a bond motion and DOJ letter to counsel agreeing to bond, revealed the following:

Kenneth Bailynson was the founder, president and registered agent of Good Decisions Sober Living, Inc. (GDSL) in Palm Beach County and asked Mark Agresti to be the medical director, to which he agreed.  Mr. Bailynson, Dr. Agresti, Stephanie Curran and Matthew Noel were all indicted in U.S. District Court for health care fraud and conspiracy as a result of allegations that they obtained patients through kickbacks/bribes, submitted false insurance claims, concealed false claims to insurers, and diverted the proceeds for their personal benefit.

Dr. Agresti said that GDSL patients were a very small part of his practice and that he only made about $50,000 from GDSL in total.  Mr. Bailynson paid him a monthly fee by check based on the number of patients Dr. Agresti was treating for GDSL. Dr. Agresti believed in frequent urinalysis as a deterrent and to quickly identify patients who had started using. He did not realize Mr. Bailynson was using a much more expensive urinalysis than the one intended.

Dr. Agresti acknowledged that, when the number of patients went up, he told Mr. Bailynson that he should get more money, however, that was to be transparent funds paid by check to compensate him for the additional time GDSL required of him.  On one occasion, Mr. Bailynson gave Dr. Agresti $3,000 cash and Dr. Agresti told him to never give him cash again. He then told his secretary to log the cash payment in the ledger.  Mr. Bailynson testified that he gave Dr. Agresti three $9,000 cash payments, in addition to his $9,000 monthly checks, as follows:

On or about May 21, 2014, Mr. Bailynson claimed that he gave Dr. Agresti two envelopes in his office. One contained a $9,000 check and the other contained $9,000 cash.

In or about June 2014, Mr. Bailynson claimed that he gave Dr. Agresti $9,000 cash at the Palm Beach Yacht Club Bar.

In or about July 2014, Mr. Bailynson claimed that he gave Dr. Agresti $9,000 cash by having an employee named Fred put the money under the floor mat of Dr. Agresti's car.  At the time of Mr. Bailynson's allegation, he told the court that Fred was deceased.

Dr. Agresti was convicted, sentenced, and imprisoned on the charges and has an appeal pending.  The DOJ sent a letter August 15, 2022, to Dr. Agresti's attorney advising that two

EXHIBIT  A

different sources had provided information that Mr. Bailynson admitted to them that he lied under oath about Dr. Agresti receiving these payments. DOJ agreed to support Dr. Agresti's release on bond.  His attorney requested he be afforded a polygraph exam to corroborate the information provided by the cooperating witnesses.

**SUITABILITY FOR POLYGRAPH EXAMINATION**

Through observation and interview, Dr. Agresti appeared to be physically and medically suitable to take a polygraph examination.   He also appeared lucid and rational during the pre-test interview. An Acquaintance Test was administered as the first chart and revealed sufficient electro-dermal and cardiovascular reactivity to effectively conduct a polygraph examination.

**CONSENT AND INTERVIEW**

On September 1, 2022, Mark Agresti, M.D. voluntarily agreed to an interview by means of a polygraph examination at his attorney's office in Miami, FL.  The conference room used was reasonably free of distractions. He stated that he understood the purpose for the polygraph examination and indicated willingness to take the polygraph examination by signing the "Consent to Polygraph Agreement" form after being given an overview of the polygraph process.  Based on the background information noted above, the following relevant questions were formulated.

**RELEVANT QUESTIONS**

   A polygraph examination was administered using the following relevant questions, all of which were answered "No":

1.   Did you receive any $9,000 cash payments from that man?
2.   Did you receive any $9,000 cash payments from that man in 2014?
3.   Did you receive any $9,000 cash payments from that man in any way?

"That man" was defined as being Kenneth Bailynson and the attached Interview Route Map was used to thoroughly define the cash payments.

**METHODOLOGY**

The technique used to examine Dr. Agresti was a Utah Zone Event Specific (single Issue) Probable Lie Comparison Question Test.  Studies leading to its creation began in the 1970s through the efforts of Drs Raskin, Kircher and Honts and over 30 years of research support its principles.  The Utah ZCT meets the APA January 1, 2012, Validated Techniques Requirement for Evidentiary testing, Paired Testing, and Investigative Testing.  Note: Dr. Raskin testified in U. S. District Court, Middle District of Florida, in December 2014, that he reviewed a polygraph examination conducted by this examiner and that it was a properly conducted Utah examination meeting the standards of the profession.

EXHIBIT  A

**EXAMINATION TECHNIQUES**

A stimulation test was administered as the first chart to assess the examinee's physiology and reactivity by directing the examinee to lie on a particular number in a sequence of numbers. During this process, the examinee's basic reactivity was assessed.  This assessment is used to evaluate fitness for continued testing, to adjust the instrument to the examinee's physiology and for comparison with the subsequent polygraph charts.  The examinee's response patterns were acceptable, and he reacted appropriately when telling a directed lie.  A comparison question technique was utilized using probable lies.  Three relevant questions were asked, and three charts were collected.

**CHART EVALUATION**

Spot analyses are made at the relevant question spots for each of the four components used: two components used to record respiratory responses, one component used to record galvanic skin response (sweat gland activity), one component to record changes in cardiovascular activity (changes in blood pressure and heart rate) and one component to record peripheral vasomotor activity (changes in blood volume in the extremities).  The analysis is completed by comparing the reactions to relevant questions with the reactions to comparison questions.

Sufficient reactivity was observed and quantified, thus allowing for objective numerical scoring using the Empirical Scoring System-Multinomial (ESS-M).  Numerical scoring is the standard for both evidentiary and investigative examinations.  There were no indications of overt distortion of the data.

Research has shown that the most accurate way to evaluate a diagnostic polygraph examination is to use grand total scores.  With ESS-M, a grand total score of +3 or greater is an indicator of truthfulness and a grand total score of -3 or less is indicative of deception.  Total numerical scores between +3 and -3 are considered inconclusive, unless there is a spot score of -7 or less, which is indicative of deception, using the two-stage rule.  The examiner's evaluation resulted in a score of +12. These analytic results support the conclusion that there were NO SIGNIFICANT REACTIONS INDICATIVE OF DECEPTION in the loading of recorded changes in physiological activity in response to the relevant test stimuli during this examination.

**INSTRUMENTATION**

A Lafayette LX6 computerized polygraph with Software Version 11.8.6 was utilized for this examination.  This instrument is pre-calibrated by the manufacturer with a stable long-term circuit design.  In accordance with manufacturer recommendations, self-calibration of the various sensors was conducted prior to the examination, and all were found to be acceptable. Lafayette Activity Monitors were used for feet, seat, and arms during this examination.

EXHIBIT  A

James T. Orr

EXHIBIT  A



On or about May 21, 2014, Bailynson said he gave you two envelopes in your office - $9,000 check and $9,000 cash

At Palm Beach Yacht Club Bar Bailynson said he gave you $9,000 cash, probably somewhere around June, 2014

**$9,000 CASH PAYMENTS FROM KENNETH BAILYNSON**

In or about July 2014, Bailynson said he gave you $9,000 cash by having an employee named Fred put it under the floor mat in your car

EXHIBIT  A

# Curriculum Vitae

## Of

## James T. Orr

Tampa, Florida

813-504-2533

Fax:  813-920-3108

EXHIBIT  A

# CURRICULUM VITAE

James T. Orr

Tampa Polygraph Services, LLC

James Orr Investigations, LLC

Tampa, Florida

Business/Mobile:  813-504-2533

Fax:  813-920-3108

Email:  orrpoly@gmail.com

Web:  www.TampaPolygraphServices.com

## CONTENTS

I.     **EDUCATION AND GENERAL BACKGROUND**

II.     **POLYGRAPH TRAINING AND CONTINUING EDUCATION**

III.     **PROFESSIONAL EXPERIENCE AND ASSOCIATIONS**

IV.     **POLYGRAPH EXAMINATIONS ADMITTED IN FEDERAL COURT**

EXHIBIT  A

**I**

## EDUCATION AND GENERAL BACKGROUND

1.  Saint Clair County Community College, Port Huron, Michigan: AA in law Enforcement, 1974.

2.  Oakland Police Academy, Oakland County, Michigan: Graduated in 1976 with top academic award.

3.  Madonna College, Livonia, Michigan: B.S. in Criminal Justice, 1980.

4.  University of Michigan-Dearborn: Two years of part-time studies toward a Master of Public Administration. No degree due to employment and relocation by the Federal Bureau of Investigation.

5.  Westland City Police Department, Westland, Michigan: Police Cadet, 1974 – 1976.

6.  Westland City Police Department, Westland, Michigan: Police Officer, 1976 – 1983.

7.  Federal Bureau of Investigation:  October 2, 1983 to January 1, 2011:  Assigned as a Special Agent in Shreveport, Louisiana; Baltimore, Maryland and Tampa, Florida.

8.  Tampa Polygraph Services, L.L.C.:  Established January 2011; owner and polygraph examiner, conducting polygraph examinations in the United States and abroad.

EXHIBIT  A

9.    James Orr Investigations, L.L.C.:  Established July 2011; owner and primary investigator.  Investigations since retirement from the FBI have included health care fraud, mortgage fraud, corporate fraud, insurance fraud, accident investigations, background investigations for police applicants, background investigative interviews of police chief candidates, investigative interviews for attorneys, surveillance and executive protection.  Writer is also the contract special investigator for the Hillsborough County Attorney's Office and the Hillsborough County Administrator's Office.

10.   Peak Credibility Assessment Training Center, Cape Coral, FL:  April 2016 to present, Senior Polygraph Instructor in the United States and abroad, teaching basic and advanced classes. Peak Credibility Assessment Training Center is accredited by the American Polygraph Association and is recognized by the American Association of Police Polygraphists.

11.   Academy of Polygraph Services, Fort Myers, FL:  June 2012 through March 2016, primary instructor in the United States and abroad. The Academy of Polygraph Science is accredited by the American Polygraph Association as well as being recognized by the American Association of Police Polygraphists.

12.   E-merging Technologies Group, Reston, Virginia:  June 15, 2014 to December 2014, contract polygraph examiner for the United States Defense Intelligence

EXHIBIT  A

Agency (DIA) with a Top Secret/SCI security clearance.

II

## POLYGRAPH TRAINING AND CONTINUING EDUCATION

1. Basic Forensic Psychophysiology/Polygraph Examiner course, Department of Defense Polygraph Institute (later named Defense Academy of Credibility Assessment/now named National Center for Credibility Assessment), Fort McClellan, Alabama, January – April 1999.  This was a fourteen-week course focusing on physiology, psychology, polygraph history and theory, chart interpretation, conducting examinations, instrumentation, interview and interrogation and other related polygraph studies.

2. FBI Annual Polygraph Examiners Conference, April 27-29, 1999 (24 hours training).

3. FBI Annual Polygraph Examiners Conference, July 10-14, 2000 (40 hours training).

4. FBI Polygraph Training and Certification, September 19-20, 2000.  Eight hours of training and FBI polygraph examiner certification awarded.

5. Federal Interagency polygraph Seminar, FBI Academy, June 18-22, 2001 (40 hours training).

6. FBI Polygraph Unit In-service Training, FBI Academy, March 12-14, 2002 (24 hours training).

7. FBI Annual Polygraph Examiners Conference, April 21-26, 2002 (24 hours training).

8. FBI Annual Polygraph Examiners Conference, April 13-18, 2003 (24 hours training).

9. American Polygraph Association (APA) Annual Seminar/Workshop, August 3-8, 2003 (27.75 hours training).

10. CIA University, Cross-Cultural Training, April 22-23, 2004 (17 hours training).

11. Department of Defense polygraph Institute transition course from analog to computerized instrument, May 4-5, 2004 (16 hours training).

EXHIBIT  A

12. FBI Annual Polygraph Examiners Conference, June 14-18, 2004 (24 hours training).

13. Critical Incident Response Group (CIRG) National Center For The Analysis of Violent Crime Behavioral Analysis unit (BAU) Interview and Interrogation of Islamic Extremists Working Group, November 16-17, 2004 (16 hours training).

14. FBI Mid-Atlantic Region Polygraph Near East Interview and interrogation Workshop, December 1-2, 2004 (16 hours training).

15. FBI Annual Polygraph Examiners Conference, June 27-July 1, 2005 (24 hours training).

16. FBI Annual Polygraph Examiners Conference, May 22-26, 2006 (24 hours training).

17. FBI Lafayette LX 4000 Conversion Training, FBIHQ, January 12-16, 2007 (40 hours training).

18. FBI Annual Polygraph Examiners Conference, June 11-15, 2007 (24 hours training).

19. American Polygraph Association (APA) 42nd Annual Seminar, New Orleans, Louisiana, August 20-24, 2007 (37.5 hours of training).

20. FBI Annual Polygraph Examiners Conference, June 16-20, 2008 (33 hours training).

21. FBI Polygraph Electronic Signature training, FBIHQ, October 22-23, 2008 (16 hours training).

22. FBI Annual Polygraph Examiners Conference, June 22-26, 2009 (33 hours training).

23. Israeli Security Service Counter Terrorism Seminar, Tel Aviv and throughout Israel, November 29 – December 10, 2009 (80 hours training – Also served as Head of Delegation for FBI).

24. Department of Defense Countermeasures Comprehensive Course, Linthicum, Maryland, October 4-8, 201 (40 hours training).

25. Florida Polygraph Association Training Seminar, Melbourne Beach, Florida, June 3-5, 2011 (18 hours of training).

EXHIBIT  A

26. American Polygraph Association 47th Annual Seminar and Workshop, September 11-16, 2011, Austin, Texas (37.5 hours of training).

27. Florida Polygraph Association Randall Jones School for Continuing Studies training seminar of 16 hours pertaining to the study of Advanced Polygraph Techniques at Clearwater Beach, Florida, June 1-2, 2012.  (16 hours of training)

28. Academy of Polygraph Science, Fort Myers, Florida; Examiner Refresher Course/Senior Examiner Course, November 26-30, 2012; 40 hours training.

29. Florida Polygraph Association Randall Jones School for Continuing Studies training seminar in Lake Mary, Florida, June 21-23, 2013 (18 hours of training).

30. E-merging Technologies Group at Defense Intelligence Agency (DIA), Reston, Virginia; orientation training for contract polygraph work for DIA, June 25-27, 2014 (24 hours of training).

31. Academy of Polygraph Science, Fort Myers, Florida; September 25-26, 2014 – 4 hours of Advanced Countermeasures training and 12 hours of Advanced Post Conviction Sex Offender Training, Psychology of a Sex Offender (16 hours total).

32. Academy of Polygraph Science, Fort Myers, Florida: March 25-26, 2015 – Advanced studies in various aspects of polygraph (18 hours of training).

33. American Polygraph Association 51st Annual Seminar/Workshop in Baltimore, Maryland, August 28 – September 2, 2016 (35.75 hours of training).

34. American Polygraph Association 52nd Annual Seminar/Workshop in Las Vegas, Nevada, August 28 – September 1, 2017 (25.75 hours of training).

35. Peak Credibility Assessment Training Center, Post Conviction Sex Offender Testing Course, Cape Coral, FL, March 19-23, 2018 (40 hours of training).

36. The Florida Polygraph Association study of Advanced Polygraph Techniques Seminar, Lake Mary, Florida, November 16-18, 2018 (18 hours of training).

EXHIBIT  A

37. The Florida Polygraph Association Randall Jones School for Continuing Studies of Advanced Polygraph Techniques Training Seminar, Daytona Beach, Florida, June 7-9, 2019 (14 hours of training).

38. The American Polygraph Association 54th Annual Seminar/Workshop in Orlando, FL. August 26-30, 2019 (32 hours of training).

39. Florida Polygraph Association Training Seminar, Melbourne Beach, Florida, June 11-13, 2021 (18 hours of training).

40. Florida Polygraph Association Training Seminar, Fort Lauderdale, Florida, October 22-24, 2021 (18 hours of training).

41. Florida Polygraph Association Seminar, Orlando, Florida, June 10-12, 2022 (18 hours of training).

## III

## PROFESSIONAL EXPERIENCE AND ASSOCIATIONS

1. Certified FBI Polygraph Examiner, 1999 – 2011.

2. Polygraph Examiner and Polygraph Coordinator for the Baltimore, Maryland FBI office, 1999 – 2005.  Conducted examinations in all areas of FBI responsibility, including applicant screening, security examinations of on-board employees, criminal matters, foreign counter-intelligence, counter terrorism, witness protection, Office of Professional Responsibility (internal affairs) and polygraph exams conducted abroad involving criminal, intelligence, terrorism and vetting exams of foreign police, prosecutors, judges and prison officials.  Also coordinated exams for four other examiners and myself and provided field training, certification and mentoring of new examiners.  Also periodically served in a temporary duty status at FBIHQ in the Polygraph Unit conducting exams and doing quality control review of field exams submitted by other examiners.

EXHIBIT  A

3. Polygraph Examiner and coordinator for the Tampa, Florida FBI office. Received transfer to Tampa for the purpose of assuming responsibility for the polygraph program there. Performed the same duties as described above in the Baltimore office. In both locations maintained high levels of exam quality and admission/confession rates while conducting over 2,300 exams for the FBI.

4. Owner, Tampa Polygraph Services, LLC, 2011 to present. Have conducted hundreds of exams for private attorneys, public defenders, law enforcement, private companies, private individuals, military contractors, and international security consulting firms. Exams conducted in California, Florida, Georgia, Pennsylvania, Washington, D.C., Argentina, Colombia (Spanish interpreters), Costa Rica, Dominican Republic (Spanish interpreter), Ecuador (Spanish interpreter), Haiti (using Creole interpreter) and Panama. Have conducted well over 3,000 polygraph exams.

5. Primary Instructor, Academy of Polygraph Science, Fort Myers, Florida, an APA and AAPP accredited school, 2012 to 2016.

6. Senior Polygraph Instructor at Peak Credibility Assessment Training Center, Cape Coral, Florida, an APA and AAPP accredited school. Mr. Orr has been a guest lecturer at the University of Baltimore School of Law, Stetson University Law School, the University of South Florida Forensic Psychology course, the American Association of Police Polygraphists annual seminar in Louisville, Kentucky, The Arizona Polygraph Association annual polygraph seminar in Phoenix, the Canadian Association of Police Polygraphists in Ottawa, Canada, the Deadwood, South Dakota Regional Polygraph Seminar, Florida Polygraph Association seminars, the Global Polygraph Network seminar in Buffalo, New York, the Indiana Polygraph Association annual seminar in Indianapolis, the Mississippi Polygraph Association annual seminar in Oxford, Mississippi, the Tri-State Seminar in Greenville, S. C. and taught a 40 hour interview and Interrogation course to the Jamaican National Constabulary's Lottery Scam Task Force in Montego Bay for the U.S. Department of State.

7. Full Member of the American Polygraph Association, 2001 – present. Associate member, 1999 – 2001.

8. Former full member of the Maryland Polygraph Association.

EXHIBIT  A

9.  Full member of the Florida Polygraph Association, 2005 – present.
    **FPA Certified Polygrapher. *Serving as a member of the Board of
    Directors and Vice President-Private.***

10. Full member of the American Association of Police Polygraphists,
    2013-present.  Recipient of the 2017 American Association of Police
    Polygraphists Region V Richard O. Arther Director's Award.

11. Former member of the FBI Agent's Association.

12. Full Member of the Society of Former Special Agents of the FBI,
    January 2011 – present; National and Suncoast Chapters.

13. Member, Florida Association of Licensed Investigators, 2011-2019.

14. As a licensed private investigator, have conducted investigations for
    law enforcement (background), Hillsborough County Attorney's
    Office, defense and civil litigation attorneys, major companies,
    celebrities and television producers, as well as conducting electronic
    counter-surveillance sweeps.

## POLYGRAPH EXAMINATIONS ADMITTED IN FEDERAL COURT

Mr. Orr conducted a polygraph examination on Jesus Hernando Angulo Mosquera in which that
examination has been admitted as evidence, without stipulation, at trial.  *United States District
Court, Middle District of Florida, Tampa Division.  United States of America vs Jesus Hernando
Angulo Mosquera, Case No.: 8:14-cr-379-T-36TGW, Document 161, Filed 04/09/2014.
Subsequent to an evidentiary hearing on 12/23/2014 on the admissibility of polygraph evidence
in this matter under Federal Rule 702, the court granted and will permit the polygraph evidence
to be admitted at trial.*

Mr. Orr also testified as an expert witness before Judge Honeywell prior to sentencing regarding
a polygraph examination he conducted on Laura Leyva in a healthcare fraud case.  *United States
District Court, Middle District of Florida, Tampa Division.  United States of America vs Laura Leyva,
Case No.: 8:14-CR-00107-CEH-AEP, Document 42, Filed 10/26/2014.*

In another case, United States of America vs Kathryn Jasen, Glenn Jasen, Case No.: 8:15-cr-
214JDW-TBM-2, United States District Court, Middle District of Florida, a polygraph report of
Mr. Orr was utilized by an attorney representing the defendant post-conviction.  The report,
prepared subsequent to a polygraph exam for the original attorney, was allowed by Judge
James D. Whittemore to be considered for mitigation purposes during sentencing.

EXHIBIT  A

These three polygraph exams were featured in the August 2017 edition of "The Champion", a professional periodical of the National Association of Criminal Defense Lawyers.  The article was authored by Christopher Kerr and was titled "Effective Defense Polygraphs".   This article was reprinted with permission in the January/February edition of the American Polygraph Association journal.

In United States of America vs Deborah Pierre, Billy Altidor and Evanie Louis, Case No.: 6:19-cr-14-ORL-31 DCI, United States District Court, Middle District of Florida, polygraph reports of Mr. Orr were utilized in sentencing hearings by two attorneys from different law firms who represented two of the defendants in this case.  The third defendant was acquitted and the two remaining defendants risked losing cooperation credit for testifying against the acquitted co-defendant.  After Judge Gregory A. Presnell admitted their polygraph exams, they revealed they had not committed perjury in testifying against their co-defendant and they got full  credit for cooperation at sentencing.

Justice Project Polygraph:  Thomas Raynard James was arrested on May 9, 1990, for the January 17, 1990 robbery and murder of Francis McKinnon in Coral Gables, Florida.  He was subsequently convicted based solely on eye-witness testimony, with no physical evidence to connect him to the crime.  The Miami-Dade State Attorney's Office (SAO) eventually looked into the case under its Justice Project.  The final, and "very important" hurdle, in their investigation was a polygraph examination of the defendant conducted by James Orr on April 25, 2022.  The SAO shared the cost of the exam with defense attorney Natalie Figgers and the State's polygraph examiner, Scott Weigman, monitored the exam.  Mr. James was found by both examiners to be truthful when he denied any involvement in the robbery/murder.  On April 27, 2022, in the Circuit Court of the Eleventh Judicial Circuit In And For Miami-Dade County, Florida, Case No. F90-23928, Judge Miguel de la O issued an order vacating all judgements, convictions and sentences in this case and Mr. James was released after serving 32 years of his life sentence.

EXHIBIT  A