UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-CR-80124-RUIZ

UNITED STATES OF AMERICA

v.

MARK AGRESTI,

      Defendant.

_____/

**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE**

The United States hereby respectfully submits the following response to Defendant Mark Agresti's Motion For A New Trial Based on Newly Discovered Evidence Pursuant to Fed. R. Crim. P. 33 (DE:585) ("Motion"). Agresti argues that he is entitled to a new trial because Kenneth Bailynson, his co-conspirator and a key Government witness, recanted his testimony about making secret cash payments to the Defendant—a recantation Bailynson later retracted in an interview with the Government, claiming he lied to his fellow inmates to avoid looking like a "snitch."[1] The Defendant has failed to meet his burden of establishing that he is entitled to a new trial, and this Court should deny his Motion.

First, because Bailynson retracted his recantation, his so-called prior lies are not newly discovered evidence under the law of this Circuit. Second, even if Bailynson had lied about paying Agresti cash kickbacks—which did not form the basis of any charge against Agresti—that lie would not have resulted in the Defendant's acquittal. The vast majority of Bailynson's trial testimony was corroborated by other witnesses and documents. Not only that, Bailynson was cross-examined extensively and admitted to the jury that he was a liar and a cheat, diminishing the

---

[1] The Court has ordered an evidentiary hearing in this case in mid-August and can hear from Bailynson himself regarding his retraction; the Government submits that Bailynson's testimony on this cash kickbacks issue did not affect the verdict but has no objection to the evidentiary hearing so the Court can fully assess this issue.

1

value of any additional impeachment (which is not a valid basis for a new trial in any event). And, importantly, Agresti testified in his own defense. That testimony made clear that the Defendant had lied to the FBI in an earlier interview, not to mention on the stand. The jury evaluated the Defendant's credibility, together with the rest of the Government's overwhelming evidence, and convicted him. Accordingly, the Defendant is not entitled to a new trial.

## FACTUAL & PROCEDURAL BACKGROUND

### A. The Indictment

On June 22, 2018, the grand jury returned an indictment against the Defendant, along with Ken Bailynson, Stephanie Curran, and Matthew Noel (DE:3). The Defendant was charged with conspiracy to commit health care and wire fraud, in violation of 18 U.S.C. 1349 (Count 1); and eleven substantive counts of health care fraud, in violation of 18 U.S.C. 1347 (Counts 2-12). The allegations against Agresti arose out of his role as the medical director at Good Decisions Sober Living (GDSL) for more than four years, during which time the Defendant ordered scores of medically unnecessary and expensive urine drug testing ("UA"). The Defendant's co-conspirators, including GDSL owner Ken Bailynson, pled guilty prior to trial.

### B. The Trial

After an eleven-day trial (DE:357)—and only approximately 3 hours of deliberation—the jury convicted the Defendant of all twelve counts (DE:399).

During trial, the Government presented testimony from thirteen witnesses including Bailynson; two insurance program witnesses (Garret Shohan of Aetna, and Rhonda Santos of Optum); two former patients (T.H. and D.P.); a former GDSL employee and patient (Felicia Ortiz Calume); a former GDSL laboratory employee (Lindsey Sangillo); two cooperating witnesses who worked at a different addiction treatment facility where the Defendant was the Medical Director

(Paul Materia and Eric Snyder); a medical expert witness admitted pursuant to Fed.R.Evid. 702 who analyzed multiple patients' files in depth (Dr. Margaret Jarvis); a retired IRS agent who analyzed banking records (Pamela Martin); a consultant who analyzed trends in GDSL's billing data and patient files (Melissa Parks); and a rebuttal witness (FBI SA Bill Stewart). The Government also introduced voluminous documentary evidence, including medical records, emails, text messages, billing data, and bank records. The defense called five witnesses, including the Defendant.

The Government's evidence at trial established the following:

- The Defendant served as GDSL's Medical Director for the entire four-year conspiracy period (GX8; GX76).

- UA tests come in three basic varieties: a cheap Point of Care (POC) test, a more expensive analyzer POC test, and an expensive confirmatory UA test performed in a lab, which can be billed for thousands of dollars per test (Jarvis/Sangillo testimony).

- Insurance companies reimburse only for medically necessary tests. Insurance companies operate on a "trust-based" system which depends on the ordering doctor to tell them the truth about the medical necessity for UA tests, and to use such tests in treatment of the patient (Shohan/Santos Testimony; GX64).

- The Defendant was responsible for ordering UA tests for GDSL residents and attesting to their medical necessity (Shohan/Santos testimony; Sangillo testimony; Ortiz testimony; Bailynson testimony; GX51; GX71-1-71-12).

- Bank records established that GDSL made virtually all of its money from UA testing (GX35; GX48).

- GDSL residents T.H. and D.P. testified that residents at GDSL were subject to mandatory UA roughly three times per week, the results of which were not discussed with residents nor factored into their treatment. After completing initial POC testing, GDSL sent all urine samples to a laboratory—eventually the GDSL laboratory owned by Bailynson— for confirmatory UA testing (GX51; Sangillo testimony; Bailynson testimony; Ortiz testimony). Each confirmatory UA test was billed to insurance companies for hundreds or even thousands of dollars per test (GX17; GX21; GX39; GX46; GX47).

- At some point during the conspiracy, GDSL opened its own laboratory so that it could bill for confirmatory UA testing itself (GX55; Bailynson/Sangillo/Ortiz testimony). After the opening of the lab, the Defendant provided a letter to GDSL, which purported to order that

3

    the frequency of UA testing should decrease over time (GX54). Bailynson testified that this surprised him, because GDSL had been confirmatory testing all residents 2-4 days per week for the last year and a half, pursuant to the defendant's order (GX51). Bailynson explained that he confronted the Defendant about the letter, and the Defendant assured him this protocol letter was simply a "CYA" letter, but that GDSL would not have to change its testing protocols. And despite this letter, GDSL's patient records and insurance billing data confirmed that no change whatsoever was made to GDSL's practice of ordering confirmatory testing every other day. (GX42; GX46; GX47). The Defendant knew that GDSL's protocol never changed, because, among other things, he occasionally logged into KIPU to review UA test results (GX42; GX44; GX45).

- Indeed, months after sending the letter purporting to order a reduction in confirmatory testing over time, the Defendant signed a written order instructing that extensive confirmatory UAs—which included lab tests for dozens of substances irrespective of the resident's particular addiction— were to be performed on *all* samples provided by GDSL residents (GX51). The results of these confirmatory UAs, however, were not available for days or even weeks after the test had been administered (Sangillo testimony; Jarvis testimony). Agresti usually did not review the results of the confirmatory UA testing, and when he did, he did so in bulk long after the results were available (Parks testimony; GX42; GX44; GX45).

- In Dr. Jarvis's expert opinion, there was no medical necessity underlying the Defendant's confirmatory UA testing protocol. Rather, the tests were for dozens of substances unrelated to the patient's addiction; the test results were not reviewed by doctor, nor could they be reviewed in time to be used in treatment; and the testing frequency was not individually tailored to individual patients.

- The Defendant was aware that confirmatory UAs were billed for large sums of money to private insurance companies. For example, the Defendant frequently received checks from insurance companies intended for GDSL, as well as correspondence from insurers requesting additional information regarding the UAs he had ordered (GX50; GX53; GX84; GX85). GDSL employees also routinely emailed the Defendant to ask that he respond to insurance company requests for additional documentation to support the UAs he had ordered (GX71-1-71-12; Ortiz testimony). The Defendant signed follow-up letters to the requesting insurers falsely attesting to the medical necessity of the UAs he had ordered (GX77).

- The Defendant was the Medical Director at numerous other addiction treatment facilities in the Palm Beach area during the time he worked at GDSL (GX89). One of those facilities was Real Life Recovery. Eric Snyder and Paul Materia, who worked at Real Life Recovery, testified that Agresti also ordered frequent confirmatory UAs for their patients. Snyder and Materia testified that the Defendant knew how much UAs could be billed to insurance companies, and that he did not review the results of the UAs he ordered. Real Life Recovery employees, like the GDSL employees, emailed Agresti begging him to review UA test results (GX87; GX88).

- In August 2014, the Defendant decided to resign from GDSL when insurance companies began denying claims coming from *his* medical practice. Agresti sent numerous text messages to Bailynson explaining, among other things, that he did not want to deal with the insurance companies anymore but would provide another doctor's NPI number to Bailynson so that Bailynson could continue to "bill." The Defendant's text messages confirmed that he was aware his testing protocol was illegal, because—when faced with scrutiny—he ordered Bailynson to stop confirmatory UAs and to "only confirm if positive [on the POC]" until the new doctor took over (GX76).

- After a search warrant was executed at GDSL in September 2014, the Defendant agreed to an interview with the FBI and other law enforcement personnel. At that interview, Agresti denied any knowledge that Bailynson/GDSL was billing for confirmatory UAs *at all* (Stewart testimony).

- The Defendant testified. He admitted to ordering frequent, expansive confirmatory UAs, which would test for dozens of drugs, but claimed he did so because he believed such frequent testing would save lives. He further admitted that he had access to GDSL patient files through its electronic system, KIPU, but that he did not review the UA results because he believed that someone at GDSL was doing so and would ask for help if needed. Agresti also claimed he expected GDSL to comply with his order to reduce testing over time, despite the fact that the testing frequency never changed. The Defendant explained that frequent testing was particularly important at sober homes, which did not themselves provide treatment. But Agresti admitted that he ordered the same frequency of testing at Real Life Recovery, which was not a sober home but was in fact a treatment center.

### C. The Relevant Bailynson Testimony

Bailynson testified that about six months after the GDSL lab opened, he learned that the Defendant had failed to review and sign off on around 2500 UA tests (Tr. Jan. 26 at 347-48). In May 2014, Bailynson met with the defendant to confront him about the issue. (*Id*. at. 348). During the meeting, the Defendant took out a stopwatch to illustrate how long it would take him to sign off on all of the tests. (*Id*. at 349-350). The Defendant then said, "that he wanted his fee increased to 9,000 per month in a check, and then he said he wanted an additional 9,000 a month in cash." (*Id*. at. 350). The Defendant "wanted the money that day" or else "he was going to drop being medical director." (*Id*. at. 352). Bailynson provided the cash to the Defendant at his office (*id*. at

5

352), and the next month at the Defendant's country club, (*id*.).[2] After that, one of Bailynson's drivers, Fred, delivered the cash (*id*. at. 354-55); Fred subsequently passed away, (*id*. at. 355).

### D. Bailynson's Post-Trial Recantation and Retraction

After the Defendant's trial and sentencing, a witness (Witness 1) contacted the FBI to report that, among other things, Bailynson had bragged to a mutual acquaintance (Witness 2) that he had made up his testimony regarding the cash payments to the Defendant. Witness 1 provided the FBI with screenshots of text messages between Bailynson and Witness 2 in which Bailynson claimed he fabricated the cash payments in order to ensure the Defendant would be convicted at trial.[3] The FBI interviewed Witness 2, whom Bailynson had befriended at the Federal Detention Center. Witness 2 confirmed the conversation and provided a complete copy of the text message chain. In the text messages, Bailynson claimed that both he and the Defendant were "innocent," that "there was no crime," and that he "said the stuff about the cash" to make sure the Defendant was convicted. Bailynson further claimed that he had done nothing wrong because "at any point the insurance companies could have said no," but that they "didn't do that, and didn't have a standard of care until a few years after I closed down." Witness 2 also confirmed that the cash payments were the only thing Bailynson claimed to have fabricated in his testimony at trial. Bailynson's co-defendant, Mark Noel, also told the FBI that Bailynson claimed to have lied on the stand about the cash payments, and that the FBI had pressured him to lie.

---

[2] Bailynson did not testify that he and the Defendant had lunch at the club, rather that they met for "maybe about ten minutes or so" near the bar because the Defendant was meeting with someone else. (*id*. at. 353). Accordingly, the Defendant's claim that he never had lunch at his club in June or July 2014 is irrelevant.

[3] Witness 1 also provided the Government with Bailynson's cell phone, which the Government has not reviewed. The Government is working with counsel for both Bailynson and the Defendant to conduct limited consensual searches of the cell phone, which will then be provided to the Defendant.

The FBI (and the undersigned prosecutors) interviewed Bailynson by video. In that interview, Bailynson said he had not fabricated anything, including the cash payments, in his trial testimony. Bailynson said that he lied to Matt Noel about committing perjury and about the FBI having pressured him to lie. Bailynson explained that he had lied to Witness 2 and Matt Noel about committing perjury, because he did not want to appear to be helping the Government. Bailynson said that he had never lied to the Government in debriefings or in his testimony, and that he understood his obligation to tell the truth in that context, notwithstanding the fact that he was a frequent liar in his personal life.

## LEGAL STANDARD

The decision to grant a new trial rests within the discretion of the district court and may be based on either of two grounds: "one based on newly discovered evidence . . . and the other based on any other reason, typically the interest of justice . . . ." *United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006). (internal citations omitted). Motions for a new trial based on newly discovered evidence are highly disfavored in the Eleventh Circuit and should be granted only with great caution. *Id*. (citation omitted).

To prevail on a motion for a new trial based on newly discovered evidence, a defendant must satisfy four criteria: (1) the evidence must be newly discovered and have been unknown to the defendant at the time of trial; (2) the evidence must be material, and not merely cumulative or impeaching; (3) the evidence must be such that it will probably produce an acquittal; and (4) the failure to learn of such evidence must be due to no lack of diligence on the part of the defendant. *Bentley v. United States,* 701 F.2d 897, 898 (11th Cir.1983); *see also United States v. Metz,* 652 F.2d 478, 479 (5th Cir.1981) (new trial based on new evidence granted only with great caution). The defendant bears the burden of justifying a new trial. *Campa*, 459 F.3d at 1151.

In particular, motions for a new trial based on witness recantation are viewed with extreme caution. *Newman v. United States,* 238 F.2d 861, 862 (5th Cir.1956). And when a witness recants and later retracts his recantation, no new trial is warranted because the witness's "version of events remains exactly as it was at trial." *United States v. Santiago*, 837 F.2d 1545, 1550 (11th Cir. 1988). In other words, "the recantation coupled with its retraction serves only to act as an attack on the witness's credibility." *United States v. Gaffney*, 689 F.Supp. 1580, 1588 (S.D. Fla. 1988). Accordingly, "retraction of an earlier recantation of trial testimony does not qualify as newly discovered evidence." *United States v. Puentes*, 50 F.3d 1567, 1578 (11th Cir. 1995).

Finally, a district court's ruling on a motion for new trial will not be reversed unless that ruling is so clearly erroneous as to constitute an abuse of discretion. *United States v. Williams,* 816 F.2d at 1530; *United States v. Metz,* 652 F.2d at 479.

## ARGUMENT

### A. Bailynson's Post-Trial Recantation and Retraction Are Not Newly Discovered Evidence.

To start, the Eleventh Circuit has squarely held that witness recantation followed by retraction does not constitute newly discovered evidence. *See Puentes*, 50 F.3d 1567, at 1578. In *Puentes*, the defendant argued that newly discovered evidence entitled him to a new trial after a cooperating witness "informed a journalist that he would recant his testimony" (*id*.). However, the cooperating witness later retracted the recantation in an affidavit (*id*.). The Eleventh Circuit, noting that retracted recantations are not newly discovered evidence, held that the district court had not abused its discretion in denying the defendant's motion for a new trial. (*Id*.).

Likewise, in *Gaffney*, 689 F.Supp. at 1581-82, a district court in the Middle District of Florida considered a motion for a new trial based upon a sworn statement by a former employee of the defendant who testified against him in a mail fraud trial. The former employee's statement

claimed that he lied when he testified that the defendant had asked him to remove a typewriter from the office and hide it in the former employee's home. (*Id*. at. 1582). But the former employee later provided a second sworn statement in which he retracted his recantation, explained that he provided the initial statement only because of "emotional stress" and promises made to him by the defendant, and affirmed that his trial testimony was true. (*Id*.). Applying *Santiago*, 837 F.2d 1545, the district court concluded that the former employee's "retraction of his recantation of his trial testimony serves to make the recantation a nullity, leaving [the former employee's] testimony at trial unaffected." (*Id*. at. 1583).

So too here. Bailynson retracted his earlier recantation, leaving the substance of his trial testimony exactly as it was. Any additional cross examination of Bailynson would thus be nothing more than impeachment and would not form a proper basis for a new trial. *See, e.g., United States v. Champion,* 813 F.2d 1154, 1171 (11th Cir. 1987) ("Newly discovered impeaching evidence is insufficient to warrant a new trial."); *United States v. Brown,* 423 F. App'x 891, 892 (11th Cir. 2006) (affirming denial of motion for new trial where newly discovered evidence of cooperator's prior fraud charges was "merely impeaching"); *United States v. Diaz*, 190 F.3d 1247, 1255 (11th Cir. 199) (sworn statement by witness contradicting his trial testimony was "relevant solely for the purpose of impeaching his credibility" and would not have resulted in an acquittal).

### B. Even Assuming Bailynson's Recantation Constituted Material, Newly Discovered Evidence, Its Introduction At Trial Would Not Have Produced An Acquittal.

Even assuming the Defendant could establish that Bailynson's statements to Witness 1 constituted newly discovered evidence and that such evidence was not merely impeachment, his claim would nonetheless fall flat because the Defendant cannot establish that he probably would have been acquitted. The Defendant argues that Bailynson's testimony regarding the cash

9

payments constituted "case-dynamic-altering testimony" which somehow sealed the Defendant's fate by establishing intent, and without which the Government could not win. (Mot. at 18).  Not so.  To start, the cash payment testimony went to motive, which is not an element of the offense, not intent.  The Government proved intent through just about every witness, KIPU record, email, text message, and standing order in the case.  And the Defendant's attack on Bailynson's credibility during cross-examination was particularly effective:  Bailynson admitted he was a liar.

First, the evidence of Agresti's guilt—in particular that he knowingly and willfully authorized expensive, medically unnecessary UA testing for submission to insurers—was overwhelming.  That evidence was not limited to Bailynson's testimony, nor did it turn on cash kickbacks.  Rather, the evidence included the corroborating testimony of other GDSL employees and residents regarding GDSL's frequent UA testing; expert testimony that the UA testing the Defendant ordered at GDSL was not medically necessary and not used in treatment; GDSL's KIPU files, bank records, and billing data; Melissa Parks's extensive analysis and summary of those records, confirming among other things that the Defendant rarely reviewed UA test results; text messages in which the Defendant assured Bailynson he would find Bailynson another doctor to help him "bill," emails from GDSL employees to the Defendant begging for his help convincing the insurers to pay; and testimony by Materia and Snyder regarding the Defendant's identical UA testing protocols at another addiction facility.  The evidence also showed that the Defendant falsely told the FBI he was entirely unaware of GDSL's confirmatory UA testing, which lie spoke volumes about his knowledge that his conduct was illegal.  On the witness stand, however, the Defendant admitted both to ordering *and* to failing to review the confirmatory UA tests at issue in the case.[4]

---

[4] The jury was free to consider the Defendant's testimony as substantive evidence of guilt.  *See e.g., United States v. Brown,* 53 F.3d 312, 315 (11th Cir. 1995) (noting that "the defendant's testimony, denying guilt, may establish, by itself, elements of the offense" especially "where the elements to be proved for a conviction include highly subjective elements: for example, the defendant's intent or knowledge").

Second, defense counsel cross examined Bailynson extensively about his credibility. And Bailynson admitted repeatedly to being a liar, including during questioning about the cash payments to the Defendant. For example:

> Q. You testified when you were on the stand that you paid Dr. Agresti some cash in addition to the 9,000-dollar checks?
>
> A. I did.
>
> Q. Counsel asked you where did you get the cash -- well, part of that discussion with Counsel was that you're a gambler -- you're a card player and a gambler, and you always had cash laying around?
>
> A. Absolutely.
>
> Q. And so there would be no record of it? Even though you did it, there would be no record of it?
>
> A. Sir, I made a lot of money over many years gambling, and I'm a criminal. So no, I didn't pick it up as income.
>
> Q. Well, thank you for that, but you -- you said you made a lot of money gambling, and you were an IRS cheat; right? You're admitting that?
>
> A. Absolutely.
>
> Q. Over many -- you've been an IRS cheat for many years?
>
> A. Probably over 25 years when it came to the IRS. Q. So when you were a certified public CPA in New Jersey, you were an IRS cheat?
>
> A. Yes.
>
> Q. Basically, you've been a cheat your whole professional career?
>
> A. Yes.
>
> Q. And going along with cheating is being dishonest?
>
> A. Yes.
>
> Q. And being a liar?

11

> A. Yes.
>
> Q. So you've been a liar for your whole professional career and you've been a cheat for your whole professional career; is that right?
>
> A. Yes.
>
> Q. Ultimately, you're going to ask the ladies and gentlemen of this jury, though, to believe you just this time; right? "Just believe me this one time"?
>
> A. Yes.

(Tr. Jan. 28, 2022 at 449-51).

There is more. Later in the cross examination, defense counsel turned back to Bailynson's testimony about the cash payments:

> Q. You were the one that was there. I just asked you whether or not you -- you paid -- you claimed to have paid $9,000 in cash that doesn't show up on any books, anywhere in any record, in any journal, nothing except your word?
>
> A. I'm very good at what I do.
>
> Q. You're very good at what you do, but in this case, you were being an absolute criminal, tax evader?
>
> A. I was apparently the entire time. So, of course, I'm going to be very good at it.
>
> Q. So you're a good criminal? You're a good money launderer?
>
> A. Yes, sir.
>
> Q. You're a good gambler?
>
> A. Very good.
>
> Q. And you're a good liar?
>
> A. Very good.
> …
> Q. So we have to rely on the words of a convicted health care fraudster and admitted liar -- admitted liar. I didn't -- that was your words. You -- so we have -- so we want to rely on what you say to convict Dr. Agresti -- partly to convict Dr. Agresti of a serious crime, health care fraud; right?

>A. Yes, and your client is the one who chose to do business with me.
>
>…
>
>Q. And so we're left back with you to tell the tale. This is -- you know, I don't want to say it's convenient, but it's sure convenient that the only person that says this about the $9,000 is you.
>
>A. It's awfully convenient for your client.
>
>Q. That it's just you, the liar, saying it?
>
>A. Yes.

(Tr. Jan. 28, 2022 at 455-56, 459, 462). Bailynson admitted outright that he was a "liar," a "criminal," and a "cheat." The jury heard that testimony—and the Defendant's—and still convicted in a matter of hours. The Defendant fails to explain how additional cross examination regarding Bailynson's (now recanted) post-trial statements would have resulted in an acquittal.

Because of the Government's overwhelming evidence, along with Bailynson's thorough impeachment during cross examination, the Defendant cannot meet his burden of establishing he is entitled to a new trial. *See United States v. Cortes-Meza*, 685 F.App'x 731, 737 (11th Cir. 2017) (affirming denial of motion for new trial where defendant could not establish a new trial would produce an acquittal in light of the "overwhelming evidence supporting Defendant's conviction"); *United States v. Blanco*, 732 F.Supp. 1155, 1156-57 (S.D.Fla.1990) (denying motion for new trial where defense could not meet its burden of establishing newly discovered evidence would result in an acquittal, because "overwhelming evidence was presented in support of the defendants' guilt in this case"). This Court should reject the Defendant's claim.

The Defendant attempts to evade his burden by urging this Court to consider the Government's late disclosure (after Bailynson's direct examination but before cross) of Bailynson's pre-trial interview report which described the cash payments. He argues the late

13

disclosure impacted his defense strategy and hindered his ability to prove the falsity at trial (Mot. at 15-16). The Defendant even goes so far as to say that he would not have testified or put on a case at all had the cash payment testimony been exposed as a lie before trial. (Mot. at 11-12). The Defendant further argues that (i) his own post-trial polygraph examination; (ii) the Government's recent interview of the attorney Bailynson claimed could corroborate his cash story (the attorney had no memory of it); and (iii) the investigation he has now conducted regarding the "physical unlikelihood" of Bailynson's description of Fred's cash drop would have established that Bailynson was lying and thereby altered the defense strategy.[5]

But this Court cured any discovery violation when it granted the Defendant a full day continuance during trial to prepare for Bailynson's cross examination. In that time, defense counsel could well have, for example, picked up the phone to call Bailynson's attorney or asked the Defendant to describe his office layout during that time. Even if the Court had not cured the violation, however, the Defendant's claim that he would have changed his entire defense strategy is not persuasive in light of the overwhelming additional evidence he and his witnesses attempted to rebut during the defense case. In other words, the Defendant would be unable to show the substantial prejudice required to warrant a new trial based on a discovery violation. *Cf. United States v. Noe*, 821 F.2d 604, 607 (11th Cir. 1987) (remanding for new trial where defendant had *already testified* and Government introduced in rebuttal statements by the defendant it had failed to produce in discovery, noting that "the degree to which [a defendant's] rights suffer as a result of a discovery violation is determined not simply by weighing all the evidence introduced, but rather by considering how the violation affected the defendant's ability to present a defense")

---

[5] Bailynson never testified about the details of the cash deliveries to the Defendant's office, although he provided additional detail in the interview report. The Defendant now claims his office layout was such that Fred could not have delivered the cash as Bailynson described.

(emphasis added); *United States v. Cuellar*, 617 F. App'x 966, 969 (11th Cir. (2015 (distinguishing *Noe* and affirming district court's denial of motion for mistrial after Government failed to produce defendant's interview report before he testified because "the other evidence against [the defendant] was significant" and defendant could not show prejudice).

In short, this Court should reject the Defendant's attempt to sidestep his burden: to demonstrate he would have been acquitted had Bailynson's (now retracted) post-trial statements regarding the cash payments been exposed to the jury. In light of the overwhelming evidence at trial, together with his already-robust cross examination of Bailynson, the Defendant cannot meet that burden.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion For A New Trial should be denied.

Respectfully submitted,

          MARKENZY LAPOINTE
          UNITED STATES ATTORNEY
          SOUTHERN DISTRICT OF FLORIDA

          GLENN S. LEON
          CHIEF, FRAUD SECTION
          CRIMINAL DIVISION
          DEPARTMENT OF JUSTICE

By   /s/ *Amanda Perwin*
      AMANDA PERWIN (FL BAR # 46814)
      Assistant United States Attorney - S.D.F.L.
      JAMES V. HAYES (FL BAR # A5501717)
      Senior Litigation Counsel
      United States Attorney's Office- S.D.Fla.
      99 N.E. 4th Street
      5th Floor
      Miami, FL 33132
      James.Hayes@usdoj.gov
      Amanda.Perwin@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 7, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

                                                          *Amanda Perwin*